[No. 1357.]

GEORGE TAYLOR *v.* THE STATE.

1. MURDER—CHARGE OF THE COURT.—The trial court charged the jury in a murder trial as follows: "As a general rule, the law implies malice from the fact of killing; and all the circumstances of necessity, accident, or infirmity, which excuse, justify or extenuate the act, are to be proved by the accused, unless they arise out of the evidence produced by him." *Held,* error, as imposing upon the accused a burden of proof unauthorized by law. See the case of *Jones* v. *The State, ante* p. 1, on the subject.

2. SAME.—See the opinion *in extenso* for a charge of the court *held* error, because unauthorized by any evidence adduced on the trial.

APPEAL from the District Court of Clay. Tried below before the Hon. B. F. Williams.

The indictment in this case was presented in the district court of Clay county on the tenth day of December, 1879. It charged

the appellant with the murder of Samuel Kershaw, on the eighteenth day of September, 1879, in the unorganized county of Hardeman, which, at that time, was attached to the organized county of Clay for judicial purposes. The appellant was brought to his trial at the August term, 1881, of the district court of Clay county, and was convicted of murder in the second degree, and was awarded a term of eighteen years in the State penitentiary as punishment.

William Johnson testified, for the State, that he knew Samuel Kershaw, the deceased, who was killed by the defendant at the rancho of the witness, in Hardeman county, Texas, on the eighteenth day of September, 1879. The first that the witness saw of the defendant on that day, he was approaching the rancho, in company with one Hadnot, an employe of the witness, from an easterly direction. The rancho building stood forty feet east and west by eighteen feet north and south. The witness, when he first saw the defendant and Hadnot approaching, was standing back of the smoke house, which stood some fourteen feet in the rear of the main building. After the defendant and Hadnot passed out of sight, the witness went into the west or cook room to light his pipe, and, while doing so, he heard a pistol or gun fire, and heard the ball strike the house, tearing splinters from the plank. Thereupon the witness left the cook room, passing out and around the smoke house and going towards the creek, and to a crib about eighty or a hundred yards distant. He passed by Morrison and Beverly as he went, and took with him Beverly's pistol, which he drew from Beverly's scabbard as he passed him. The witness left the premises because he saw that the defendant and Hadnot were both armed with Winchester rifles, and feared that the defendant would kill him. En route the witness heard another shot. He did not know who fired either of the shots.

When the witness left the cook room, which was between eleven and twelve o'clock, Kershaw was standing at the table cutting meat for dinner with a large butcher knife of the model known as "skinning knife." When the witness returned to the west or cook room he found Kershaw lying dead on the floor. He had been shot under the left eye. The cooking stove was in the northwest corner of the room. There was a table on the south side of the room, between the west end of the house and the south door, and it extended to a point about one-third across the door. The body of the deceased lay about three feet from

the stove, and between it and the table. The witness, Morrison and Beverly were sitting together when the witness first saw the defendant and Hadnot riding towards the house, and the next time the witness saw the defendant he was talking to Hadnot and Beverly, about fifty or sixty yards from the house. Flowers was somewhere about the house. The witness saw no one in the room with the deceased at the time the first shot was fired, which was from the outside. When this shot was fired the witness was in the house, where he had been perhaps a minute or a minute and a half, lighting his pipe. He left the room when the shot was fired, but did not run until he passed the outside or smoke house. It was while going from this house to the crib, that he heard the second shot.

The witness remained about the crib for some little time, and from there went down the creek and climbed a bank, from which he could see the front of the rancho. After a time he went back to the house, and found the deceased lying dead, as described. The butcher knife with which he had been cutting meat lay within six inches of his hand, with the point turned toward his hand. The face was powder burned, and brains and blood were scattered on the wall in a direction they would have been sent by a ball shot from the south door. He found a forty-four calibre Winchester rifle ball imbedded in the wall, and ranging from the same direction. The defendant had a forty-four calibre Winchester rifle. The witness was the prosecuting witness in this case, and had employed special prosecuting counsel.

J. W. Morrison testified, for the State, that about half-past eleven o'clock on the morning of the killing, he saw the deceased in the west or cook room of Worsham, Stevens and Johnson's rancho. He heard two shots on that occasion, and within two or three minutes he saw the defendant on the south side of the rancho with his gun in his hand. The defendant there and then told the witness that he supposed he had killed the "poor short horned boy;" that Hadnot had nothing to do with it; that he himself had done it; that he had come after old man Johnson, and intended to get him if it took a year, and that he was sorry for the poor young man. The defendant remained about the rancho about twenty minutes after this. When the witness heard the shots he went around the east end of the house, and as he approached the defendant, the latter leveled his gun on the witness and ordered him to halt. Beverly went around the

west end of the house when the shots fired. When the defendant left, he rode off, alone.

After the defendant left, Beverly went into the cook room first, and the witness followed, and found Kershaw dead His body lay south of the middle of the room, his head west, and near the west wall, and his feet east, and near the east end of the table. The witness saw the print of a ball on the wall west of the body, and took it to be the impression of a ball of forty-five calibre. The witness saw a butcher knife lying near the body, and saw blood on the wall near the body.

The witness and Beverly were inside of the small room in the house back of the rancho when the first shot was fired. Johnson had just left and gone into the cook room, from which, after the first shot, he issued in a rapid walk after that shot, going past the room the witness and Beverly were in, and he remained away for about a half an hour. When the second shot was fired, the witness was standing in the door of the small room back of the house. Beverly had started around the west end of the house at that time, and was separated from the cook room, in which the shooting occurred, only by the wall of the box house. There were three rooms and walls between the witness and the cook room, as he went around the east end of the house. When the witness got around the house Beverly was standing about fifteen feet from the southwest corner of the cook room. When the defendant and Hadnot first came up the witness saw no guns, and could not say that they had guns then.

Beverly was present when the defendant spoke of killing the deceased. The defendant's language was: "I have killed the poor short-horned innocent young man, and am sorry for it; but he ought not to have made the break on me that he did." The witness did not think that the defendant said that he had come to "see" old man Johnson; but, according to the recollection of the witness, he said that he had come to "get old man Johnson." The witness did not hear the defendant say anything about the deceased having a butcher-knife or coming at him with a knife.

Charles Beverly testified, for the defendant, that he was at Johnson's ranch on the morning of the shooting. At about half-past eleven o'clock on that morning he, Morrison and Johnson were in the small room in the rear of the main building. Sam Flowers and the deceased were in the west or cook room of the main building. While the witness, Morrison and Johnson were

sitting in the room described, the witness saw the defendant and Hadnot approaching the house from the east, at a distance of about three or four hundred yards. Johnson then went into the cook room where the deceased was, and while he was in there the witness heard a shot fired. Johnson came running out of the cook room immediately, and grabbed the witness's pistol from its scabbard. The witness then started around the west end of the house to the south side. While passing around this way, the witness heard a noise like the shuffling of feet in the room where Kershaw was, and at the same time he heard some one speak. Within a minute after starting the witness reached the northwest corner of the west room, and, as he was passing that corner he heard the voice, the shuffling of feet, then a second shot and a heavy fall. The defendant stepped out of that room just as the witness passed the corner of the room to the front of the house, and said to the witness and Mr. Morrison, "I have killed the young man in the room and am sorry for it, but he ought not to have run at me with the butcher knife. He ought to have stood back when I told him, and not crowd me with the butcher knife." The defendant then repeated that he was sorry, and requested the witness to go in and see if the deceased did not have a butcher knife.

The witness went into the room and found Kershaw dead, with a butcher knife lying on the floor, about four inches south of his right hand, on the south side of his body, with the handle of the knife pointing to the south. The witness was in the room just long enough to see that Kershaw was dead, about two seconds perhaps. He did not know what passed between Morrison and the defendant while he was in the house. Morrison was present when witness came out of the room, and seemed excited. Flowers and Hadnot were also present.

According to this witness, the defendant asked where Mr. Johnson was, and said that he wanted to see him. He did not say that he had come after old man Johnson, and would have him if it took a year. The defendant addressed all of his remarks to the witness, and if he had made such statement the witness would have heard him. The defendant was not acquainted with the deceased, and had never seen him previously more than once, if at all. The deceased was a much larger man than the defendant. The witness had known the defendant for about three years, and was well acquainted with his reputation as a peaceable, law abiding man; and it was good. He knew

nothing of any hard feeling between Johnson and the defendant.

H. C. Babb, Tom Waggoner and C W. Easley testified, for the defense, that they were well acquainted with the reputation of the defendant as a peaceable man, and that it was good.

The motion for new trial was voluminous, and set up, among others, the errors for which the judgment is reversed.

*W. B. Plemons* and *R. M. Donley,* for the appellant, in opposition to that paragraph of the charge which is the subject of the first ruling of this court, cited *Richardson* v. *The State,* 9 Texas Ct. App., 615; *Black* v. *The State,* 1 Texas Ct. App., 391; *Guffee* v. *The State,* 8 Texas Ct. App., 208; *State* v. *Swaze,* 30 La. Ann., 1325; *The People* v. *Moody,* 45 Cal., 289.

*N. P. Jackson,* also for the appellant, filed a brief and argument.

*H. Chilton,* Assistant Attorney General, for the State.

HURT, J.   The appellant, George Taylor, was tried and convicted of the murder of Samuel Kershaw.   The conviction was of murder in the second degree, with eighteen years confinement in the penitentiary as punishment.   The court below charged the jury as follows:

"As a general rule the law implies malice from the fact of killing, and all the circumstances of necessity, accident, or infirmity which excuse, justify or extenuate the act, are to be proved by the accused, unless they arise out of the evidence produced by him."

This charge is radically wrong.   The burden is not upon the defendant to prove "all the circumstances of necessity, accident or infirmity which excuse, justify or extenuate the act."   The charge given was intended to enlighten the jury upon the subject of implied malice, or murder of the second degree.   What had the infirmity (if any) of defendant to do with the subject? Nothing whatever.   If the evidence shows that defendant with a deadly weapon killed the deceased, and the law would presume malice, and if the evidence discloses nothing further, it would be the duty of the jury to convict of murder of the second degree.   It would be the duty of the judge in such a case to instruct the jury to the effect that if they believed from the

evidence that the defendant killed the deceased with a deadly weapon, the law would presume malice, and the killing would be murder of the second degree.

The supposed case would be very rare indeed, for it is highly improbable that no other facts would be shown touching the killing. In the case in hand there were other facts bearing directly upon the homicide. This being the case, the jury should be left to pass upon, not a divided case, but the whole case. And in such a case it is not proper for the court to cast the burden upon the defendant. Indeed, this being a matter bearing directly upon the guilt of defendant, it is error for the court to shift the burden upon the defendant, whether there be other attending facts or not. See this subject, as the writer thinks, exhaustively discussed in *Priest Jones* v. *The State,* decided at this term of the court, *ante,* page 1.

The latter portion of this charge is, if possible, at a greater distance from the law than that last noticed. It is as follows: "Unless they arise out of the evidence produced by *him.*" Suppose facts or circumstances arise out of the evidence adduced by *the State* tend clearly to justify or excuse the defendant, the jury are charged in effect that these facts or circumstances *thus produced* will not suffice—that they, to be relied upon by defendant, must arise out of the evidence produced by the *defendant.* To state the proposition is all that is required to show its fallacy. Viewed in the light of the principles of criminal law, it is beyond discussion.

The court also charged the jury that: "If you believe from the evidence and beyond a reasonable doubt that defendant was engaged in an effort, with his express malice aforethought, to kill one Johnson, and that, in order to prevent him from taking the life of said Johnson, the said Kershaw assaulted the defendant, and the defendant, for the purpose of protecting himself from such assault, shot and killed the said Kershaw, then such killing under such circumstances would not be justifiable, but would be murder in the second degree."

Does the evidence in this case furnish a basis for this charge? We think not. Johnson had left the house, and was not in view of defendant when Kershaw was shot. It may be true that defendant shot at Johnson while Johnson was in the house with deceased, and it may be also true that defendant intended to kill Johnson; but there is no evidence tending to prove that at the time defendant shot Kershaw he, defendant, was making

any attempt to kill Johnson. To justify this charge it would not be necessary for defendant to have been in the very act of shooting Johnson; any demonstration showing an immediate intention to kill Johnson would have been sufficient. The demonstration at the time is wanting in this case. That defendant had shot at Johnson and intended to kill him would not suffice; his conduct must have shown an immediate intention to kill Johnson.

For the errors in the charge, as above indicated, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered November 15, 1882.